IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Roanoke Division

ROBERT J. COLLIER,

        Plaintiff,

v.

LAND & SEA RESTAURANT COMPANY,
LLC d/b/a FRANKIE ROWLAND'S
STEAKHOUSE

Defendant/Third Party Plaintiff,

v.

Case No.: 7:13-cv-104

PERFORMANCE FOOD GROUP, INC.
d/b/a PERFORMANCE FOOD SERVICE –
VIRGINIA,

Third Party Defendant/Fourth Party Plaintiff,

WEAVER FRESH SEAFOOD & PRODUCE,

Third Party Defendant,

v.

SAM RUST SEAFOOD, INC.

Third Party Defendant and
Fourth Party Defendant

**MEMORANDUM OF THIRD PARTY DEFENDANT SAM RUST SEAFOOD,
INC. IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO SECOND
AMENDED THIRD PARTY COMPLAINT OF DEFENDANT AND THIRD PARTY
PLAINTIFF LAND & SEA RESTAURANT COMPANY, LLC**

**SUMMARY OF ARGUMENT-FAILURE TO PROVIDE REASONABLE NOTICE-
ADMISSION THAT THERE WERE NO DEFECTS IN PRODUCTS OF THIRD PARTY
DEFENDANT SAM RUST SEAFOOD, INC.**

{00131203.DOCX }

This action arises from a meal that Plaintiff Robert J Collier (Collier) ate at Defendant Land & Sea Restaurant Company, LLC d/b/a Frankie Rowland's Steakhouse (the Restaurant). The Restaurant has now filed a Third Party Complaint against Sam Rust Seafood, Inc. (Sam Rust). Apparently, it is the view of the Restaurant that the indemnity clause in the vendor agreement between Sam Rust and Performance Food Group, Inc. (PFG), allows the Restaurant to avoid its obligation to provide prompt notice under the Uniform Commercial Code. That is wrong. The Uniform Commercial Code serves as the "default option" and can be varied by agreement. The notice obligations in the indemnity clause have been changed by agreement, but only as between Sam Rust and PFG. The Restaurant is still obligated to provide notice as required by the Uniform Commercial Code.

On April 14, 2011, Collier ate at the Restaurant. Collier became very ill that evening and was admitted to the emergency room at Roanoke Memorial Hospital early in the morning of April 15, 2011. By April 16, 2011, Collier's condition had deteriorated significantly. The hospital contacted the Virginia Department of Health ("the VDH"). The VDH immediately began an investigation, including an inspection of the Restaurant. The VDH also contacted the Centers for Disease Control and Prevention ("CDC"). The VDH contacted the owners of the Restaurant and performed the inspection in the presence of the Restaurant's head chef to identify the food that Collier may have eaten on April 14 and also to inspect food handling and storage procedures at the Restaurant.

On June 14, 2011, Liberty Mutual (the worker's compensation insurance carrier for Collier's employer) notified the Restaurant of a potential claim for a work related injury. On June 20, 2011 and December 20, 2012, Collier's counsel sent letters to the Restaurant advising it to notify its insurance company and that Collier intended to make a claim against the Restaurant

for injuries suffered as a result of food poisoning after dining at the Restaurant on April 14, 2011.

The Restaurant purchases its food for retail sale from several vendors including PFG. PFG purchases its food for wholesale distribution from vendors including Third-Party Defendant Sam Rust Seafood, Inc. ("Sam Rust").

VA Code § 8.2-607 required the Restaurant to notify its vendors "within a reasonable time" in order to preserve any rights to Indemnity that the Restaurant may have had. The Restaurant failed to put Sam Rust on notice of a potential defect with their products. The Restaurant is now "barred from any remedy."

## STATEMENT OF UNDISPUTED FACTS

1. On Tuesday, August 20, 2013, Third-Party Defendant Sam Rust Seafood, Inc. propounded Requests for Admission to Plaintiff Robert J. Collier and Defendant Land & Sea Restaurant Company, LLC and Third Party Defendant-Fourth Party Plaintiff Performance Food Group, Inc. Exhibit 1.

2. On Wednesday, September 18, 2013, the Restaurant admitted that the documents attached as Exhibit 1 were true and accurate copies and did not object to their admissibility on grounds of authenticity. Exhibit 2.

3. On Friday, August 30, 2013, PFG admitted that the documents attached as Exhibit 1 were true and accurate copies and did not object to their admissibility on grounds of authenticity. Exhibit 3.

4. On Thursday, April 14, 2011, a party of six, including Collier, ate a meal at the Restaurant. Sam Rust Requests for Admission PFG000028.

5. On Friday, April 15, 2011, Collier "began getting sick midnight. 2–3am ambulance – vomiting." Sam Rust Requests for Admission PFG000044.

6. On Friday, April 15, 2011, Collier arrived at the hospital at 4:03 AM. "Onset of illness began Thurs[day] evening with a cough, neck and back discomfort, nausea, vomiting, headache and sweating. Progress to loss of voice, neck pain, feeling weak, drowsy, sharp pain radiating down his neck to his back." Sam Rust Requests for Admissions PFG00043.

7.  Collier's condition progressed to a state of "intubation and sedation."  Sam Rust Requests for Admissions PFG000032.

8.  On Saturday, April 16, 2011, Collier was "no longer sedated but continues to be intubated. Opens eyes, blinks and nods head."  Sam Rust Requests for Admissions PFG000041.

9.  By Saturday, April 16, 2011, a physician at Collier's hospital alerted the Virginia Department of Health ("VDH") via the Blue Ridge Poison Control for a consult regarding Collier's condition. Sam Rust Requests for Admissions PFG000032.

10.  In response to Collier's illness, the VDH opened an investigation of the Restaurant on or about Saturday, April 16, 2011.  Sam Rust Requests for Admissions PFG000041.

11.  On Saturday, April 16, 2011, the VDH "called . . . [a member of Collier's party] . . . who . . . eats at [the Restaurant] weekly and knows the manager very well. Has alerted the manager to the problem." Sam Rust Requests for Admissions PFG000041.

12.  By Saturday, April 16, 2011, VDH "placed a call to the [Centers for Disease Control and Prevention] ("CDC")."  Sam Rust Requests for Admissions PFG000032.

13.  On Saturday, April 16, 2011, Collier's "situation [was] sufficient in [the] Center for Disease Control's assessment" for the dispatch of an "antitoxin from the NY quarantine station" to the hospital treating Collier in Roanoke, Virginia.  Sam Rust Requests for Admissions PFG000031.

14.  On Sunday, April 17, 2011, the VDH was concerned that "if CDC thinks the facts of this case warrant treatment of the index case with botulinum antitoxin, do we not have a public health emergency on our hands?"  Sam Rust Requests for Admissions PFG000041.

15.  The VDH wondered "about paralytic shellfish poisoning especially.  If that or some alternative in the differential diagnosis is more likely, what are the public health implications guiding our next actions?"  Sam Rust Requests for Admissions PFG000041.

16.  On Monday, April 18, 2011, the VDH wondered "if we are dealing with something different with the hospitalized patient compared to the rest of the dining companions.  I could not find many agents that offer such a variety of s/s [probably symptoms], ranging from n/d [probably a reference to nausea and diarrhea] to paralysis. Onsets dates/times of illness and additional clinical information would be helpful. The only agent that I found that includes GI sxs [medical shorthand for gastrointestinal symptoms] and paralysis is ciguatera poisoning, but this involves the consumption of tropical reef fish (ex: barracuda, grouper, red snapper), and I did not see mention of this in the list of foods eaten.  The incubation period for paralytic shellfish poisoning is very rapid (few minutes to half hour) and I do not see mention of GI sxs [medical shorthand for gastrointestinal symptoms] associated with it. Diarrhetic shellfish poisoning does not contain a paralytic component and it also causes rapid illness onset (usually 4 hours).  C. bot[ulinum] typically has a longer incubation period (18 – 36 hours, range of 2 hours to 8 days)." Sam Rust Requests for Admissions PFG000040.

17. On Monday, April 18, 2011, the VDH "checked with the Roanoke hospital on the status of the patient following bot antitoxin administration. Apparently, he tolerated the antitoxin without any problems, but he has not shown any marked change in the 24 hour since he received it. According to the nurse I spoke with, he had no feeling in his extremities yesterday, but today has some feeling in his hands, feet, and shoulders.  It sounds like the doctors are still on the fence about whether this is truly botulism, paralytic shellfish poisoning, or Guillain-Barre. They did collect blood, stool, and gastric aspirate samples prior to antitoxin administration, which will hopefully be arriving soon."  Sam Rust Requests for Admissions PFG000037.

18. On Monday, April 18, 2011, "from approximately 2:30 PM to 4:00 PM, Cindy McDow, District Food Standardization Officer, and Martha Lees, Environmental Health specialist senior, conducted an inspection of [the Restaurant] for fact-finding due to suspected food poisoning which may have been contracted on the evening of April 14, 2010. The restaurant did not open for service until 4 PM.  The inspection was conducted with Head Chef James Nelson." Sam Rust Requests for Admissions PFG000005.

19.  One purpose of the inspection was to "verify what the patient ate – and what the others ate (using credit card data or other info that restaurant might be able to provide)." Sam Rust Requests for Admissions PFG000038.

20.  The "items reviewed" centered on individual foods consumed by members of Collier's party.  Sam Rust Requests for Admissions PFG000005.

21.  VDH identified that an order of Oysters Rockefeller "was eaten by [Collier's] party."  (See Mot., Exh.   ).  Sam Rust Requests for Admissions PFG000005.

22.  Collier's party also "ate one of [the] lobsters."  Sam Rust Requests for Admissions PFG000005.

23.  Restaurant Head Chef "Nelson agreed to place tags on the [remaining] lobsters stating 'Do Not Use' and . . . not serve [the] lobsters" until "given approval to do so from the health department."  Sam Rust Requests for Admissions PFG000005.

24.  On Monday, April 18, 2011, the VDH "reviewed the implicated restaurant and consulted with owners this afternoon preceded by a brief conference call around 2 p.m.  Shellfish from Thursday is gone already, except for 3 lobsters.  Restaurant management is holding the lobsters pending further guidance (lobsters have been associated with paralytic shellfish poisoning).  Tomorrow the restaurant will be able to provide us a listing of food items served last Thursday."  Sam Rust Requests for Admissions PFG000036.

25.  As of Monday, April 18, 2011, "[t]he restaurant [was] not aware of other ill diners" who consumed food purchased from the Restaurant on April 14th.  Sam Rust Requests for Admissions PFG000038.

26.  In response to VDH's request, on April 19, 2011, Head Chef "Nelson provided the health department with . . . a copy of the bill for [Collier's] party of six.  Sam Rust Requests for Admissions PFG000006.

27. On Tuesday, April 19, 2011, the VDH planned to have Collier communicate by "[b]link[ing] your eyes (or nod, or move a finger – whatever he can do)." Sam Rust Requests for Admissions PFG000007.

28. On Wednesday, April 20, 2011, the VDH noted that Collier's "situation has not changed for better. He has lost significant movement. The hospital was to do a plasma exchange yesterday and due to device node failures, that was postpone[d] to today. The cause of illness is still unknown. More lab results are on their way this evening." Sam Rust Requests for Admissions PFG000050.

29. By Friday, April 22, 2011, the VDH "still [did not] have a diagnosis. The index patient is very ill. He is undergoing plasmapheresis due to suspicion of Guillain-Barre syndrome and its variants.. Botulism and paralytic shellfish poisoning remain in the differential [diagnosis]." Sam Rust Requests for Admissions PFG000026.

30. On April 22, 2011, Head Chef Nelson contacted the VDH "to ask how long the restaurant is required to hold the lobsters," and "asked if the health department will pay for these lobsters" and "requested a ruling by . . . April 24, 2011." Sam Rust Requests for Admissions PFG000027.

31. On April 22, 2011, the VDH "called [Head Chef] James Nelson at [the Restaurant] . . . at 2:55 p.m. and released the lobsters for sale." Sam Rust Requests for Admissions PFG000026.

32. On June 20, 2011, Plaintiff's counsel, John Morgan sent a certified letter requesting that the Restaurant notify its insurer of Collier's alleged food poisoning so that "we may begin the claims process." it received the letters from Liberty Mutual and Collier's Attorney in June 2011, and the letter from Collier's Attorney in December 2013. Also included as part of Exhibit 4 are a June 14, 2011 letter from Liberty (the worker's compensation insurance carrier for Plaintiff's employer), and a December 13, 2011 letter from Plaintiff's counsel (highlighting added). All three letters refer to Collier's potential claim against Land & Sea. Plaintiff's counsel even mentions food-poisoning. The letters request that Land & Sea notify its insurance carrier. Exhibit 4.

33. On Wednesday, September 18, 2013, in response to Fourth-Party Defendant Sam Rust's Requests for Admission number 5, Defendant and Third-Party Plaintiff Restaurant admitted that it knew on April 18, 2011, that a person who had dined at the Restaurant on April 14, 2011, had become ill several hours after leaving the restaurant. Additionally, in response to Admission number 6, Defendant and Third-Party Plaintiff Restaurant admitted that it knew before March 19, 2013, Collier had allegedly suffered injuries as a result of food poisoning sometime after dining at its restaurant. Exhibit 2.

34. On Monday, August 30, 2013, in response to Fourth-Party Defendant Sam Rust's Requests for Admission number 5, Third-Party Defendant Performance Food Group, Inc. admitted that it received no notice of the offense described in the Complaint, or of Collier's alleged injuries, or of any alleged defect in its products, until it was served with the Restaurant's Third-Party Complaint against PFG. Exhibit 3.

35. The Restaurant's head chef James Nelson has testified that he notified PFG of the VDH inspection on April 18, 2011 either in person or by telephone or both when he spoke with PFG's sale representative, Jennifer Mika. Whether the Restaurant provided this notice to PFG is irrelevant to this Motion as to the Restaurant's Third Party Complaint against Sam Rust.

36. On March 19 and 21, 2014, the parties conducted depositions of the corporate designees of the Restaurant. Neither of the Restaurant's designees could identify with certainty the oysters that Collier is supposed to have eaten. Neither of the Restaurant's designees could identify any defect in the oysters that Sam Rust supplied to the Collier dinner party. Exhibit 5.

## **LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT**

In deciding a motion for summary judgment, the Court must view the facts in the light most favorable to the opposing party and give that party the benefit of reasonable inferences to be drawn from the underlying facts. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157-59 (1970); *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In contesting a motion for summary judgment, "[t]he opposing party must demonstrate that a triable issue of fact exists. . . ." *Id., citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine" issue of material fact is present "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." 477 U.S. at 248. A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Powers v. Sims and Levin Realtors*, 396 F. Supp. 12, 22 (E.D. Va. 1975), quoting Fed. R. Civ. P. 56(c).

## **I. VIRGINIA LAW GOVERNS THIS CASE**

A federal court sitting in Virginia must apply the substantive law of Virginia in a diversity case, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938),

including the forum's choice of law rules. *Klaxon v. Stentor Mfg. Co.*, 313 U.S. 487, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941). Under Virginia's choice of law rules, a tort claim is to be governed by the law of the place of the wrong, the *lex loci delicti*. *Abingdon Pediatrics, P.C. v. Carter*, 2002 U.S. Dist. LEXIS 4930, 36-37, 2002 WL 485038 (W.D. Va. Mar. 25, 2002). Here, the alleged breach and resulting loss occurred in Virginia. Therefore, Virginia law controls.

## II. <u>INDEMNITY AGREEMENT NOT CHANGE RESTAURANT'S OBLIGATION TO NOTIFY SAM RUST</u>

The Restaurant's quotation of paragraph 14 of the vendor agreement (Indemnification: Insurance) is selective. The Restaurant has omitted the notice obligations that are also part of the indemnity provision. The notice obligation is highlighted below.

> 14. <u>Indemnification: Insurance</u>
> A<u>. Indemnification</u>. Supplier [Sam Rust] will indemnify, defend, and hold Performance [Performance Food Group], its affiliates and subsidiaries and their officers, directors, employees and agents, as well as any customers of Performance [Land & Sea] and its subsidiaries harmless from and against any allegation asserted or damages, liabilities, losses, costs or expenses (including "reasonable" attorneys' fees) sought in any claim, action, lawsuit or proceeding connected with or arising out of any of the following (collectively, "claims"):
>
> Notwithstanding the foregoing, Supplier shall not be liable to PFG to the extent PFG's damages are determined to result from PFG's own gross negligence or willful misconduct. Supplier shall use counsel reasonably satisfactory to PFG in the defense of such Claims. **PFG shall, within thirty (30) days after receipt of notice of a Claim against PFG, notify Supplier thereof; provided, however, that failure of PFG to provide such notice to Supplier shall not limit the defense or indemnification obligations, except to the extent that the delay has a material adverse effect upon the ability of Supplier to defend such Claim.**

{00131203.DOCX } 8

As persons dealing in goods, PFG and Sam Rust can modify obligations, which they may have to each other under the Uniform Commercial Code. In this regard, the Uniform Commercial Code should be considered the "default setting" which the parties may vary by agreement. The Uniform Commercial Code itself specifically provides for variation.

> § 8.1A-302. Variation by agreement
> (a) Except as otherwise provided in subsection (b) or elsewhere in the Uniform Commercial Code, the effect of provisions of the Uniform Commercial Code may be varied by agreement.

As is usual in both State and Federal Court in Virginia, a plainly worded statute is applied in accordance with its plain meaning. The case cited below is representative.

> Having held Britt to be a debtor under Article Nine, our focus shifts to the validity of Victory Nissan's repossession of the car. "After default, a secured party . . . may take possession of the collateral . . . ." *Code § 8.9A-609(a)(1)*. Victory Nissan concedes that no default occurred in this case. [HN7] "Typically, a secured creditor may not take possession of the collateral until the debtor defaults." *Barnette, 457 F. Supp. 2d at 658* (citation omitted). **However, the parties may vary the provisions of the Uniform Commercial Code, as adopted into Virginia law, by agreement, as long as they act in good faith.** *Code § 8.1A-302*; *Becker v. National Bank & Trust Co., 222 Va. 716, 719, 284 S.E.2d 793, 794 (1981)*. See *Barnette, 457 F. Supp. 2d at 658*. Accordingly, the parties were free to agree that Victory Nissan, as the secured creditor, may repossess the vehicle after the occurrence of something other than default. This is exactly what the parties in this case did.

*Cappo Mgmt. v. Britt*, 282 Va. 33, 39, 711 S.E.2d 209, 212 (2011).

The indemnity clause specifies only the obligation of PFG to notify Sam Rust as Supplier. The indemnity clause is silent as to the obligation of other persons entitled to indemnity, such as the Restaurant, to notify Sam Rust in its capacity as a Supplier. Therefore,

the obligation of the Restaurant to provide notice to Sam Rust will be governed by the normal principles of the Uniform Commercial Code. Those principles require notice "within a reasonable time". In the section below, Sam Rust demonstrates that the Restaurant failed to provide notice as required by the "default setting" of the Uniform Commercial Code.

### III.  VIRGINIA LAW REQUIRES THAT A BUYER GIVE NOTICE OF A BREACH TO A SELLER OR BE BARRED FROM ANY REMEDY

VA Code § 8.2-607(3)(a) of the Virginia Code provides that "where a tender has been accepted . . . the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." VA Code § 8.2-607(3)(a). The term "buyer" is defined as "a person who buys or contracts to buy goods." VA Code § 8.2-103(1)(a) (2004). A "seller is "a person who sells or contracts to sell goods." *Id*. Serving food or drink for value is a sale governed by Virginia's Commercial code. See VA Code § 8.2-314(1) official comment 5 (1964).

If the evidence is clear, the court can rule as a matter of law that a party failed to give proper notice. *Begley v. Jeep Corp.*, 491 F. Supp. 63, 65 (W.D. Va. 1980). The burden of proof is on the Restaurant, as Third Party Plaintiff, to show that notice was given within a reasonable time. *Id*. "The time of notification is to be determined by applying commercial standards to a merchant buyer." *Hebron v. American Isuzu Motors, Inc.*, 60 F.3d 1095, 1097 (4th Cir. 1995) (quoting VA Code § 8.2-607(3)(a), official comment 4) (emphasis omitted). "Merchant" means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction. VA Code § 8.2-104(1).

In *Begley*, the merchant third-party plaintiff gave the merchant third party defendants notice via a third party complaint for indemnity or contribution two years and five months after the third-party plaintiffs knew or should have known that there was a potential warranty claim to be asserted against the defendants. 491 F. Supp. at 66. There, the third-party defendants argued that they should have been given notice shortly after the third-party plaintiffs were aware that the defendant's products were involved. *Id*. The defendants claimed they were deprived of the opportunity (1) to investigate the claim in a timely manner; (2) to participate in settlement negotiations before full-scale litigation; and (3) to timely depose potential witnesses, whose memories have since been dimmed by time. *Id*. Agreeing with the defendants, the court found that "the likelihood of prejudice to defendants is great." *Id*.

There, third-party plaintiffs did not give any reason to excuse their delay. *Id*. Taking notice that other courts have held that a nine month or one year lapse was unreasonable when the parties involved were merchants, the court found that the third-party plaintiffs "violated the letter and spirit of § 8.2-607(3)(a) by waiting over two years to give defendants notice and, therefore, its sanction should operate against them." *Id*. (citations omitted). Thus, the court held that "the plaintiffs failed to support their burden of proof that the notice was given within a reasonable period," and granted the defendants' motions for summary judgment. *Id*.

In *Hebron*, the Fourth Circuit Court of Appeals decided a case where the plaintiff was not a merchant, but a retail consumer. 60 F.3d at 1097. Two years after an accident involving the defendant's product, the plaintiff filed suit for a breach of implied warranty thereby giving the defendant its first notice of the claim. *Id*. After discovery had been completed, the defendant filed a motion for summary judgment based on the plaintiff's failure to provide "reasonable notice" of her claim, in violation of VA Code § 8.2-607(3)(a). *Id*. The district court granted the

defendant's motion for summary judgment, holding that the two-year unexplained delay in giving notice was unreasonable as a matter of law. *Id*.

On appeal, the court found that Virginia's Uniform Commercial Code applied to any person who buys or contracts to buy goods; however, "[a] "reasonable time" for notification from a retail consumer is to be judged by different standards . . . ." *Id*. (citing VA Code § 8.2-607(3)(a), official comment 4. "Such notice serves the important functions of promoting the voluntary resolution of disputes and minimizing prejudice to the seller from the passage of time. *Id*. at 1099. Thus, "even though the requirement of reasonable notice may be more strictly applied to merchant buyers than to retail consumers," the court affirmed the holding of the district court, finding that the two-year delay in giving notice was unreasonable as a matter of law, and the defendant's motion for summary judgment was granted.

*Begley* and *Hebron* stand for the principle that buyers must put a seller on notice of a potential breach soon after the breach is discovered. This notice allows potential defendants to: conduct investigations, preserve evidence, negotiate settlements, and generally prepare for litigation before sellers are prejudiced by the passage of time. Even under the less stringent standard for retail consumers, a two-year delay in giving notice is unreasonable as a matter of law.

In this case, the Restaurant was a merchant buyer. The Restaurant knew of potential defects in products supplied by Sam Rust on April 18, 2011, when the Virginia Department of Health conducted an inspection of the Restaurant for the purpose of identifying the foods consumed by Collier. Even if the Restaurant did not understand the potential for litigation at the time of the VDH inspection, the Restaurant was certainly on notice upon receipt of Collier's letter advising the Restaurant to notify its insurer so that "we may begin the claims process."

Sam Rust, however, received no notice until two years later, when Sam Rust was served with PFG's Fourth-Party Complaint. This delay is unreasonable as a matter of law. Accordingly, the Restaurant is barred from any recovery, in accordance with the terms of VA Code §8.2-607 and the cases cited above which interpret that section of the Uniform Commercial Code.

### IV.     RESTAURANT'S CLAIM FAILS ON THE MERITS-CORPORATE DESIGNEES UNABLE TO IDENTIFY EITHER PRODUCT OR DEFECT

Attached to this Memorandum are relevant portions of the depositions of the Restaurant's corporate designees. As brevity is the soul of good pleading, the Court need only note that neither of the Restaurant's corporate designees was able to identify specifically the product that is supposed to have made Collier ill or any defect in that product. Exhibit 5, referenced above in Statement of Undisputed Facts.

### CONCLUSION

For the reasons stated in this Memorandum, the Court should dismiss the Third Party Complaint against Sam Rust with prejudice and grant Sam Rust all other relief to which it may be entitled.

                                        SAM RUST SEAFOOD, INC.
                                        By:     /s/ C. Jay Robbins, IV
                                                Of Counsel

C. Jay Robbins, IV, Esq. (VSB No. 22847)
MIDKIFF, MUNCIE & ROSS, P.C.
300 Arboretum Place, Suite 420
Richmond, Virginia  23236
T: 804-560-9600
F: 804-560-5997
crobbins@midkifflaw.com
*Counsel for Sam Rust Seafood, Inc.*

{00131203.DOCX }                          13

## **CERTIFICATE**

      I hereby certify that on March 27, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

| | |
|---|---|
| James R. Jebo, Esq. | Ronald M. Ayers, Esq. |
| VSB No. 48418 | VSB No. 01158 |
| Dannel C. Duddy | Justin E. Simmons, Esq. |
| VSB No. 72906 | VSB No. 77319 |
| Attorneys for Performance Food Group, Inc. | Attorneys for Defendant/Third Party |
| Harman, Claytor, Corrigan & Wellman | Plaintiff Land & Sea, Inc. |
| P. O. Box 70280 | Johnson, Ayers & Matthews, PLC |
| Richmond, VA 70280 | P. O. Box 2200 |
| 804-622-1107 | Roanoke, VA 24009-2200 |
| 804-747-6085 – facsimile | 540-767-2000 |
| jjebo@hccw.com | 540-767-1552 – FAX |
| dduddy@hccw.com | rayers@jamlaw.net |
| | jsimmons@jamlaw.net |
| | |
| John J. Morgan, Esq. | Phillip R. Lingafelt, Esq. |
| CT Bar No. ct407105jjm | VSB No. 29229 |
| Attorney for Robert J. Collier | Attorney for Robert J. Collier |
| Barr & Morgan | Glenn, Feldmann, Darby & Goodlatte |
| 22 Fifth Street | P. O. Box 2887 |
| Stamford, CT 06905 | Roanoke, VA 24001-2887 |
| 203-356-15 95 | 540-224-8000 |
| 203-357-8397 – FAX | 540-224-8050 – FAX |
| jmorgan@pmpalawyer.com | plingafelt@gfdg.com |
| *Pro Hac Vice* | |

C. Richard Cranwell, Esquire
VSB No.3347
Cranwell, Moore & Emick, P.L.C.
P. O. Box 11804
Roanoke, VA 24022-1804
(540) 344-1000
(540) 344-7073 - FAXcrc@cranwellmoorelaw.com

{00131203.DOCX }                                    14

## **CERTIFICATE OF MAILING**

    I hereby certify that a true copy of the foregoing was mailed to Weaver Fresh Seafood & Produce, c/o E. Newman Weaver, Registered Agent, 2713 Old Charleston Road, Georgetown, SC 29440, on March 28, 2014.

                                                /s/ C. Jay Robbins, IV